UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ST. PAUL'S FOUNDATION and SHRINE OF SAINT NICHOLAS THE WONDERWORKER, PATRON OF SAILORS, BREWERS AND REPENTANT THIEVES<br><br>Plaintiffs,<br><br>v.<br><br>RICHARD BALDACCI, in his official capacity as Building Commissioner for the Town of Marblehead, and THE TOWN OF MARBLEHEAD,<br><br>Defendants. | Civil Action No. 19-11504 |

**VERIFIED COMPLAINT**

Plaintiffs St. Paul's Foundation ("St. Paul's") and Shrine of St. Nicholas the Wonderworker, Patron of Sailors, Brewers and Repentant Thieves (the "Shrine"), by and through their attorneys, hereby allege as follows:

**INTRODUCTION**

1. This lawsuit concerns a local government's wrongful refusal to allow a church to move forward with internal renovations to its building, preventing the church from engaging in any religious exercise whatsoever. Specifically, it concerns the Town of Marblehead's ("Town") battle against Plaintiffs' efforts to operate a church hall (the "Fellowship Hall") and celebrate the normal order of Orthodox Christian religious feasts and festivals at their monastic complex (the "Shrine") in Marblehead, Massachusetts. Most recently, the Town's Building Commissioner, Richard Baldacci, has refused for months to reinstate the Shrine's building permit. Mr. Baldacci

has no basis for his refusal to reinstate the permit, and the Town's refusal to reinstate the permit does not further any legitimate government interest. The Town's actions are preventing the Shrine from completing internal renovations, and thereby effectively preventing Plaintiffs from using the Shrine for *any* of its intended religious purposes.

2.  The Town's refusal to reinstate the building permit, thus blocking Plaintiffs from using the Shrine for any religious exercise for several months, violates the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc (2000). RLUIPA provides that "No government shall impose a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government can demonstrate that the burden is in furtherance of a compelling governmental interest and the least restrictive means of furthering that interest." § 2000cc(a)(1)(A)-(B). Neither of those is true in this case.

3.  Accordingly, Plaintiffs are asking the Court to order the Town to reinstate the building permit. The Town's unlawful actions have blocked religious exercise at the Shrine for too long already. No further delay in allowing Plaintiffs to use the Shrine for its intended religious purposes should be countenanced.

**PARTIES**

4.  Plaintiff St. Paul's is an Orthodox Christian monastic organization of Apostolic origin dedicated to preserving the deposit of faith left by St. Paul the Apostle. St. Paul's is located at 22 Endicott Ave., Marblehead, MA 01945 and 500 Delaware Ave., 8th Floor, Wilmington, DE 19801 in the United States.

5.  Plaintiff Shrine of St. Nicholas is a religious entity under M.G.L.A. c. 12 § 8F (2011) and is organized and operated exclusively to serve as an Orthodox Christian shrine dedicated to St. Nicholas the Wonderworker, Patron Saint of Sailors, Brewers, and Repentant

Thieves.  The Shrine is a "work" of St. Paul's 12– *i.e.*, it is one of St. Paul's several centers for practicing and promoting the Orthodox Christian faith that are located across the United States and globally.  The Shrine's intended use is for the celebration of religious services, the preservation and expansion of the cult of the Saint, the preservation of monastic, married clergy and laity serving the shrine, and the salvation of souls, together with such other religious, charitable, scientific and educational purposes as are contained within the meaning of 26 U.S.C. § 501(c)(3).  The Shrine's principal address is 124 Pleasant Street, Marblehead, Massachusetts.

6. Defendant Town of Marblehead is a municipal corporation organized under the laws of Massachusetts with its central office located at 188 Washington Street, Marblehead, Massachusetts.

7. Defendant Richard Baldacci is the Town's Building Commissioner, has a business address at 7 Widger Road, Marblehead, Massachusetts, and is being sued in his official capacity.

## JURISDICTION AND VENUE

8. This Court has personal jurisdiction over the defendants under Rule 4(k) of the Federal Rules of Civil Procedure as they reside in Massachusetts.

9. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. §§ 2000cc-2.  This Court also has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. § 2201.

10. Venue is proper in this Court under 28 U.S.C. § 1391(a) and (b), as all of the parties to this case, and all of the events giving rise to the causes of action set forth herein, occurred in the District of Massachusetts.

## FACTS

### The Shrine

11. The property at issue in this case is located at 124 Pleasant Street in Marblehead, Massachusetts ("Property"), and it is currently owned by the Shrine.

12. Before the Shrine purchased the Property, the Property was operated as a mixed-use facility, with mercantile and light manufacturing uses on the first floor and two residential units above.

13. The Property is located in the Town's Business One ("B1") zoning district, which permits a variety of uses as-of-right, including restaurants, retail stores, lodges and clubs, in addition to places of worship. There are several businesses in close proximity to the Shrine, including, but not limited to: Rip Tide Lounge, located at 116 Pleasant Street; Seaside Restaurant Group, LLC, d/b/a Three Cod Tavern, located at 141 Pleasant Street; Tevoc, Inc., d/b/a/ Turtle Cove Bar and Grille, located at 169 Pleasant Street; and Warwick Entertainment LLC, d/b/a/ WICKS, located at 123 Pleasant Street.

14. The Shrine purchased the Property on or about August 30, 2017, for the purpose of establishing a Greek Orthodox monastic complex including a house of worship, space for evangelization, guest house and administrative offices of St. Paul's. The entirety of the Shrine was established as a monastic complex and a house of worship, to be used regularly for conventional religious services and expression.

15. The intended use of the Shrine's monastery complex is entirely religious, and includes but is not limited to, a chapel area in which to perform formal religious services and hear confessions; a Fellowship Hall for religious festivals and evangelization; and an outdoor area that will also be used to celebrate the many feast days of the Orthodox Christian faith, including those feasts of the Orthodox Church which celebrate the memory of different saints and holy days

established according to the Ecumenical Councils and by the calendar of Ecumenical Patriarchate of Constantinople and, not limited to but with especial devotion for, Pascha (also called "Easter"), the Ascension forty days after Pascha, Pentecost fifty days after Pascha, the Synaxis of the Apostles on June 29, the Holy Transfiguration on August 6, the Dormition of the Theotokos (Mother of God) on August 15, the beheading of St. John the Baptist on 29 August, the Feast of the Exaltation of the Holy Cross on September 14, the Feast of the Nativity of the Theotokos on September 8, the Presentation of the Theotokos on September 21, the Feast of the Holy Unmercenaries Sts. Cosmas and Damian on November 1, the Feast of St. Hilarion, Feast of St. Gregory Palamas, the Feasts of Saints Martin, Menas, and Milica on November 11, the Feast of St. Nicholas the Wonderworker on December 6, Nativity of Christ on December 25, Circumcision of Christ on 1 January, Baptism of Christ (Theophany or Epiphany) on January 6, feast of St. Patrick of Ireland on March 17, the Annunciation on March 25, Palm Sunday the Sunday before Pascha (Easter) of the Mother of God.  The Orthodox Church also has 200 fast days each year, which are as important as the feast days.  There are four main fasting periods ("Lents"): Advent (the Nativity Fast), Great Lent (the Paschal Fast), Apostle's Fast (from the week after Pentecost until the Feast of Sts. Peter and Paul on June 29), and the Fast of the Mother of God (first two weeks of August until August 15).  Additionally, Orthodox monks also fast every Monday, Wednesday and Friday, and Orthodox laity fast every Wednesday and Friday outside of the weeks following the Nativity, Pascha, and Pentecost.

16. As part of religious festivals and its evangelization efforts, the Shrine intends, among other things, to brew, serve, and sell beer.  For centuries, Christian monks in general, and Orthodox Christian monks in particular, have brewed and sold beer as part of their monastic mission to serve God through "work and prayer."  *See* Spencer Brewery, *The Story of Our Brewery*,

https://www.spencerbrewery.com/index.php/our-story (last visited July 8, 2019); Loyola Press, *How Monks Revolutionized Beer and Evangelization*, https://www.loyolapress.com/our-catholic-faith/prayer/arts-and-faith/culinary-arts/how-monks-revolutionized-beer-and-evangelization (last visited July 8, 2019). Indeed, the oldest brewery in the world still operating today was originally founded by Orthodox monks in 725, who followed largely the same religious rule of life as the monks who established the Shrine of St. Nicholas today. *See* Weihenstephan Monastery Brewery, *History of the Weihenstephan Brewery in Freising, Germany*, https://www.weihenstephaner.de/en/our-brewery/history/ (last visited July 8, 2019).

17. In the Orthodox Church (*e.g.*, those particular churches of Constantinople, Alexandria, Antioch and Moscow and all those in communion with them sometimes referred to in the West as "Greek Orthodox"), beer is considered food, not alcohol, is exempt from fasting restrictions with respect to alcohol, and has been a time-honored tool to aid Orthodox Christians in fasting, celebrating feasts, and following strict dietary guidelines developed by Orthodox Christian monastics over two thousand years and documented in hundreds of Typika (rules of life of Orthodox monasteries). Blessed Hieromonk Seraphim Rose, *The Rule of Fasting in the Orthodox Church* (Feb. 26, 2012), http://www.pravoslavie.ru/77551.html; Matt Hadro, *These 17th century monks did a beer fast for Lent*, Catholic News Agency (Mar. 8, 2019), https://www.catholicnewsagency.com/news/these-17th-century-monks-did-a-beer-fast-for-lent-90886.

18. Further, the time-honored concept of evangelization through brewing is currently experiencing a revival in many places. Attracting people with beer in a relaxed, social setting at a religious institution presents an opportunity for monks to evangelize by speaking to patrons about religion to visitors, especially those who do not otherwise attend religious services. Cindy

Wooden, *Beauty and beer: Monks' outreach is part of new evangelization*, National Catholic Reporter (Aug. 24, 2013), https://www.ncronline.org/news/people/beauty-and-beer-monks-outreach-part-new-evangelization; Deirdre Mundy, *Re-evangelizing this post-Christian nation one growler at a time* (Sep. 3, 2016), https://aleteia.org/2016/09/03/rebuilding-the-catholic-culture-with-beer/; Abbey Brewing Company, *Our History* https://www.abbeybrewing.biz/ (last visited July 8, 2019); Benedictine Brewery, *Our Story*, https://www.benedictinebrewery.com/our-story (last visited July 8, 2019).

## RLUIPA

19. RLUIPA was enacted to protect all forms of religious expression from unnecessary infringement by the enactment and/or implementation of land use regulations. Indeed, RLUIPA is intended to be construed broadly and to protect religious exercise "to the maximum extent permitted by the terms of this chapter and the Constitution." 42 U.S.C. § 2000cc-3(g).

20. RLUIPA provides, *inter alia*, as follows:

No government shall impose a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government can demonstrate that the burden is:

(A) in furtherance of a compelling governmental interest and

(B) the least restrictive means of furthering that interest.

§ 2000cc(a)(1)(A) and (B).

21. Under RLUIPA, the term "religious exercise" is defined as follows:

(A) In general[.] The term "religious exercise" includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief.

(B) Rule[.] The use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.

§ 2000cc-5(7)(A) and (B).

**The Events Leading to the Town's Wrongful Refusal to Reinstate the Building Permit**

22.  Since purchasing the Property, Plaintiffs have been clear about the intended religious uses of the Shrine – *i.e.*, the formal religious services and informal religious service such as veneration of icons, and the use of prayer ropes for the Jesus Prayer, providing spiritual direction (*e.g.*, hearing confessions) in the Chapel area or the Fellowship Hall, the celebration of religious festivals in the Fellowship Hall and in the contemplated patio area, and efforts to evangelize in the Fellowship Hall and the patio area.  They unfortunately have been met with resistance from and even harassment by a number of Town officials who have sought to restrict Plaintiffs' religious exercise by, among other things, obstructing Plaintiffs' efforts to make the necessary renovations to the Shrine's first floor, threatening to impose unreasonable occupancy limits on Shrine, and otherwise impeding Plaintiffs' ability to celebrate religious festivals in the outdoor area.  The focus of this Complaint is on the Town's wrongful actions in preventing the Shrine from completing internal renovations to the first floor of the Shrine.

23.  In October of 2017, shortly after the Shrine purchased the Property, Father Andrew Bushell ("Father Andrew") – the Protos (*i.e.*, monastic officer) and Executive Chairman of St. Paul's and the Guardian of the Shrine of St. Nicholas – met with Mr. Baldacci, the Town's building inspector.  Father Andrew explained the intended religious uses of the Property and the renovations that would need to be made for those uses, including but not limited to internal renovations to the Chapel area and the Fellowship Hall.  Mr. Baldacci suggested that Father Andrew retain an architect and have the architect perform a building code review for the internal renovations.

24.  Father Andrew retained an architect as Mr. Baldacci had suggested and, in February 2018, provided Mr. Baldacci with the building code review that he had requested.

25. In early July of 2018, after numerous conversations with Mr. Baldacci, who was well-aware of the Shrine's proposed renovations and contemplated religious uses, the Shrine applied for a building permit to authorize internal first floor renovations in accordance with plans submitted by the Shrine's architect.

26. On or about July 3, 2018, Mr. Baldacci issued building permit 25497 ("Building Permit"), which authorized the proposed plans for the renovations to the first floor of the Shrine.

27. On or about July 5, 2018, work commenced pursuant to the Building Permit. Much of the work was plumbing-related, which took a substantial amount of time to bid and schedule because, among other reasons, the Town required the Shrine to obtain state variances for plumbing work, which were not granted until November 2018.

28. By letter dated January 16, 2019, Mr. Baldacci purported to "suspend[]" the Building Permit on the grounds that the prior registered design professional and construction supervisor of record had "terminated" their contract with the Shrine, thereby placing the Shrine in non-compliance with certain provisions of the State Building Code (namely, 780 Code of Massachusetts Regulations c. 1 §§ 107.6.2 and 107.6.3). Mr. Baldacci stated, however, that construction need cease only "until such time that the building department receives a new Initial Construction Control Affidavit from a Massachusetts Architect and a Licensed Construction Supervisor agrees to take responsibility for the construction project." A true and accurate copy of Mr. Baldacci's January 16, 2019 letter is attached hereto as Exhibit A.

29. Shortly thereafter, Ryan McShera, a Massachusetts architect and licensed construction supervisor, assumed responsibility for the Project. By February 13, 2019, Mr. McShera had provided Mr. Baldacci with the construction control affidavit that Mr. Baldacci had

requested. A true and accurate copy of Mr. McShera's construction control affidavit is attached hereto as Exhibit B.

30. Accordingly, as of February 13, 2019, the Shrine had satisfied the only requirement that Mr. Baldacci had imposed for reinstating the Building Permit. Mr. Baldacci, however, did not reinstate the Building Permit.

31. Thereafter, Mr. McShera and Father Andrew had several discussions with Mr. Baldacci, during which they encouraged Mr. Baldacci to reinstate the Building Permit. Mr. Baldacci focused the discussions instead on other issues, including the intended occupancy of the monastery complex. The question of occupancy had long been a point of contention between Plaintiffs and other town officials. Plaintiffs desire a high enough occupancy limit to accommodate the Shrine's use for religious festivals, along similar guidelines that the Town has applied to other churches and religious institutions in the Town. Town officials, however, have long insisted that the Shrine only have a lower occupancy limit.

32. By letter dated June 11, 2019, Mr. Baldacci formally refused to reinstate the Building Permit. A true and copy of Mr. Baldacci's June 11, 2019 letter is attached hereto as Exhibit C. Mr. Baldacci offered no reasonable explanation as to why the internal renovations authorized by the Building Permit should not be completed. For instance, Mr. Baldacci disputed statements Mr. McShera had made concerning the allowable occupancy limit. Mr. Baldacci's professed concerns concerning occupancy were either pretextual or entirely arbitrary, because there is no legitimate reason why already-permitted internal renovation work should be delayed pending a final resolution of the occupancy limit. The Town's refusal to reinstate the Building Permit does not advance any compelling governmental interest, let alone do so through the least restrictive means. Indeed, reinstating the Building Permit would merely allow the Shrine to

complete internal renovations that Mr. Baldacci already authorized when he issued the Building Permit in July 2018, and would not cause any danger or harm to the public.

33.     Mr. Baldacci's refusal to reinstate the Building Permit has left the inside of the Shrine in shambles.  It has prevented the Shrine from conducting religious services or confessions in the Chapel area (and even forced the Shrine to remove holy icons and relics from the Chapel area), made it impossible for the Shrine to use the Fellowship Hall to celebrate festivals or for evangelization purposes, resulted in the loss of supplies that the Shrine had purchased in anticipation of using them during religious celebrations, and effectively precluded altogether the exercise of religion at the Shrine.  Considering the regularity with which the Shrine intends to perform religious services (Typika allows for eight services on most days but more or less depending on the day), provide spiritual direction – *e.g.*, "hearing confessions" (typically dozens each week), preach, celebrate feast days, and generally evangelize, as well as provide a retreat for practice of the Jesus Prayer, every day of delay exacerbates the harm to Plaintiffs.

**CLAIMS FOR RELIEF**

**COUNT 1 – VIOLATION OF RLUIPA**

34.     Plaintiffs incorporate the allegations of Paragraphs 1-33 of this Verified Complaint, as if fully set forth herein.

35.     Plaintiffs are religious institutions that have the First Amendment right to the free exercise of their religious beliefs through, among other things, conducting religious services at the Shrine.

36.     Defendants, in refusing to reinstate the Building Permit, have precluded Plaintiffs from using the first floor of the Shrine for religious exercise at all.

37.     As noted in RLUIPA's legislative history:

> The right to assemble for worship is at the very core of the free exercise of religion. Churches and synagogues cannot function without a physical space adequate to their needs and consistent with their theological requirements. The right to build, buy, or rent such a space is an indispensable adjunct of the core First Amendment right to assemble for religious purposes. The hearing record compiled massive evidence that this right is frequently violated. Churches in general, and new, small, or unfamiliar churches in particular, are frequently discriminated against on the face of zoning codes and also in the highly individualized and discretionary processes of land use regulation.

146 Cong. Rec. S7774-75 (2000).

38. Defendants' refusal to reinstate the Building Permit does not further any compelling governmental interest, let alone further any such interest through the least restrictive means. Indeed, reinstating the Building Permit would merely allow the Shrine to complete entirely internal renovations Mr. Baldacci had authorized in issuing the Building Permit, and would cause no harm to anyone.

39. Defendants' actions have violated and continue to violate RLUIPA.

## COUNT II – DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

40. Plaintiffs incorporate the allegations of Paragraphs 1-33 of this Verified Complaint, as if fully set forth herein.

41. 28 U.S.C. § 2201(a) provides that "[i]n a case of actual controversy within its jurisdiction, . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

42. As alleged above, there is in actual controversy between Defendants, on one hand, and Plaintiffs, on the other, as to whether the Building Permit should be reinstated, and whether the failure to reinstate the Building Permit violates RLUIPA.

43. Therefore, Plaintiffs seek a declaration that the Building Permit should be reinstated forthwith, that the Town's failure to reinstate the Building Permit since receiving Mr. McShera's

construction control affidavit on February 13, 2019, has constituted a continuing violation of RLUIPA, and that Plaintiffs are entitled to damages attributable to Defendants' violation of RLUIPA.

44. Plaintiffs further seek an injunction requiring the reinstatement of the Building Permit.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

a) A declaratory judgment that the refusal to reinstate the Building Permit since receiving Mr. McShera's construction control affidavit on February 13, 2019, has constituted a continuing violation of RLUIPA;

b) A preliminary and permanent injunction requiring the Town to reinstate the Building Permit;

c) damages, costs, and attorneys' fees; and

d) any such and further relief that this Court deems just and proper.

Dated July 9, 2019

ST. PAUL'S FOUNDATION and SHRINE OF ST. NICHOLAS THE WONDERWORKER, PATRON OF SAILORS, BREWERS AND REPENTANT THIEVES,

By Their Attorneys,

/s/ John B. Daukas
John B. Daukas, Bar No. 552848
jdaukas@goodwinlaw.com
Kevin P. Martin, Bar No. 655222
kmartin@goodwinlaw.com
Michael K. Murray, Bar No. 563804
mmurray@goodwinlaw.com
Emily Notini, Bar No. 703765
enotini@goodwinlaw.com

GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
Telephone:	+1 617 570 1000
Facsimile:	+1 617 523 1231

## VERIFICATION

I, Fr. Andrew Bushell, declare that, I am Protos and Executive Chairman of St. Paul's Foundation and the Guardian of the Shrine of St. Nicholas, and I have read the foregoing Verified Complaint, and the allegations in the Verified Complaint are true, based on my personal knowledge, except where they are indicated to be based upon information and belief, as to those allegations I am informed and believe them to be true.

I verify under the penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on July 9, 2019.

Father Andrew Bushell