UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.: 1:19-cv-11504

ST. PAUL'S FOUNDATION and SHRINE OF SAINT NICHOLAS THE WONDERWORKER, PATRON OF SAILORS, BREWERS AND REPENTANT THIEVES

    Plaintiffs,

v.

RICHARD BALDACCI, in his official Capacity as Building Commissioner for the Town of Marblehead, and THE TOWN OF MARBLEHEAD,

    Defendants.

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

The Defendants, Richard Baldacci and the Town of Marblehead, submit this memorandum in opposition to the Plaintiff's Motion for a Preliminary Injunction.

**I.     FACTS**

The property at issue in this case is located at 124 Pleasant St. (the "Property") and is currently owned by the Plaintiffs, St. Paul's Foundation and Shrine of Saint Nicholas the Wonderworker, Patron of Saints, Brewers and Repentant Thieves. Prior to being purchased by the Plaintiffs for use as an Orthodox Christian monastic complex (the "Shrine") on or about August 20, 2017, the Property was used as an art studio which had a warehouse in the rear of the building and retail operation in the front. There also were and remain two residential units on the second floor.

The Town first learned of the Shrine's intended used for the Property on November 13, 2017, when Father Andrew Bushell ("Father Bushell"), St. Paul's Executive Chairman, contacted Marblehead's Building Commissioner, Richard Baldacci ("Baldacci"), to request a meeting to discuss his contemplated renovations of the property, which included the installation of a small brewery as well as "…moving a mechanical room, adding one bathroom on the first floor and expanding another and replacing the concrete floor in the back of the building". **Exhibit 1**, November 13, 2017 email. Baldacci responded by congratulating Father Bushell on the purchase of the Property and asked to have a meeting prior to any work taking place at the building. **Exhibit 2**, November 15, 2017 email. As a means to help him with the permitting process, Baldacci apprised Father Bushell in a follow up email that he would need to know what the space was going to be used for before issuing a building permit and certificate of occupancy relating to the proposed renovation work. **Exhibit 3**, November 15, 2017. Following a meeting at the Property, Baldacci sent Father Bushell another email on November 27, 2017 explaining occupancy and other permitting requirements based upon Father Bushell's representations regarding the scope of his desired renovations. **Exhibit 4**, November 27, 2017 email.

Having not heard anything further, Baldacci wrote in a subsequent letter dated December 19, 2017, to move the process forward, "In preparation of the change [of] the use of the building to Group A-2, assembly, to accommodate the religious area and the tasting room, the building department, fire department and health department are asking for a set of plans in order to perform a code compliance evaluation and issue a building permit."[1] **Exhibit 5**, December 19, 2017 letter. The letter detailed various requirements specified by the Building Code given both the existing conditions on the Property and the Shrine's intended use of it following renovations.

---

[1] The letter also stated, "On behalf of the building, health and fire departments, we are eager to assist you with permanently opening your tasting room and religious area to the public." **Id.**

2

**Id.** Baldacci also noted that he could not conduct a code evaluation until he received an architect's stamped drawing as, "…the requirements for egress, fire sprinklers, bathrooms and food sanitation are based on the square footage of the assembly and the number of occupants within the assembly, specifically the Tasting Room beneath the two-family dwelling." **Id.** Thus, it was then as it is still is now that whatever the use of the Property was under the Building Code it carried with it various architectural requirements that had to be met in order to qualify for a certificate of occupancy.

Over the next two months Father Bushell failed to provide any architectural plans to Baldacci who grew concerned about the situation. As a result, on February 22, 2018, he wrote to Father Bushell once more, again explaining the requirements for permitting a change of use and occupancy to the Property. **Exhibit 6**, February 22, 2018 letter. In his letter, Baldacci also reminded Father Bushell that the building could not be used for the religious service of food or alcohol unless a building permit and certificate of occupancy first issued. Four months later – a delay of his own making – Father Bushell finally applied for a building permit. Baldacci issued the permit promptly thereafter, on July 3, 2018, for a "change of use to a fellowship hall and brewery per attached drawings" (the "Project"). The plaintiff listed the firm of Siemasko + Verbridge as the "Registered Professional Responsible for Construction Control" and its architect, John Harden, was listed as the Project's general contractor.

In the months following the issuance of the permit, Baldacci received complaints that individuals were being served beer in the "fellowship hall" located in the front part of the Property. By letter dated September 18, 2018, Baldacci wrote to Father Bushell explaining that he had become aware the Shrine had been serving beer despite his prior admonishment that doing so without a certificate of occupancy was in violation of the Building Code. **Exhibit 7,**

September 18, 2018 letter. Baldacci then wrote, as he had also noted in his February 22, 2018 letter:

> Because the religious area and the serving of food and alcohol requires the use of the building to be changed to a Group A-2 assembly, to accommodate the religious area and tasting room, you cannot use the building for these purposes described until the issuance of a building permit and a Certificate of Occupancy describing the change of use to a Group A-2 occupancy.

**Id.**

In an attempt to assist Father Bushell, Baldacci then explained in his letter what steps could be taken to allow him to issue a certificate of occupancy for 20 individuals (which would allow for beer to be served in the front of Property) based on the existing plans, which called for one handicapped accessible bathroom and relevant square footage. He indicated that the permit could be issued following the completion of required electrical and plumbing inspections. **Id.** Baldacci otherwise issued a cease and desist notice as to the service of alcohol based on the incomplete occupancy as an A-2 structure.[2] **Id.**

A mere few weeks later Baldacci observed the Shrine serving alcohol to three individuals in the Property's fellowship hall on October 13, 2018 which was in violation of his instructions contained in his prior letter(s). As a result, by letter dated October 16, 2019, Baldacci issued an immediate cease and desist order. **Exhibit 8**, October 16, 2018 letter. Baldacci again detailed the Building Code issues that needed to be resolved if the Shrine was intending on serving beer to the public. **Id.** Father Bushell subsequently told Baldacci that he would obtain a plumber and electrician to conduct inspections in order to cure the occupancy problem, for reasons unknown he did not.

---

[2] Once again, Baldacci explained, "The existing use can continue as a retail establishment and you can continue to sell tee shirts, salt and beer to go, but cannot serve beer to patrons without following through with the development of the required number of bathrooms as proposed in the plan by Siemasko and Verbridge dated April 12, 2018." **Id.**

4

Two weeks later, on November 2, 2018, Baldacci observed the Shrine serving beer to individuals in the fellowship hall yet again. Around the same time, a confidant of Father Bushell's, an attorney named Tracy Stockton,[3] approached Baldacci and asked that he defer enforcement action at the Property as a "professional courtesy". **Exhibit 9**, November 6, 2018 letter. In a letter dated November 6, 2018, Baldacci declined Stockton's request, observing that "[t]he enforcement of the building code does not provide leniency with respect to life safety issues." **Id.** The letter chronicled the Shrine's continued refusal to take the proper steps towards obtaining a certificate of occupancy under the previously issued building permit or, alternatively, for an occupancy by 20 individuals based on the existing conditions of the building, despite Baldacci's urging and guidance. Based upon the Shrine's (now repeated) service of alcohol to the public, Baldacci issued a non-criminal Building Code violation. **Id.**

The Plaintiffs appealed Baldacci's violation notice to the Building Code Appeals Board ("BCAB"). After a hearing, the BCAB affirmed Baldacci's issuance of the violation notice and denied Plaintiffs' appeal, memorialized in a decision some months later, dated February 28, 2018. **Exhibit 10**, BCAB Decision. Notably, the BCAB's decision stated, in pertinent part:

> Father Bushell also argued, in some detail about how Building Code requirements may have affected the Shrine's religious practices. He asserted how what the Town has required and steps it has taken have "impeded…expression of religious freedom." He asserted that the Town Administrator had instructed public safety personnel to "stake out [the] Church and take photos of pilgrims, and people who are coming in for confession." He argued that what Town officials reportedly did constituted a "tremendous violation of [its] religious practice."
>
> The BCAB found, however, that nothing in evidence even suggests that the Building Code requirements which the Building Commissioner has been enforcing, and his efforts as described in the correspondence and testimony, have taken place in any way that discriminates against the Church's rights as the building owner. The life safety requirements that the Building Code imposes in these circumstances are intended to protect everyone who might use this building,

---

[3] According to a business certificate filed with the Commonwealth of Massachusetts, Stockton operates a law office at 124 Pleasant Street, the same address as the Shrine.

regardless of his or her religious affiliation. Everyone who uses this building, regardless of her or his religious affiliation, is entitled to the same level of safety. Thus, for example, nothing in evidence suggests that a change of use of this building designed and intended as proposed here (e.g. an establishment serving beer), but by an entity other than the Church, would be subject to different enforcement of the State Building Code by the Building Commissioner.

**Id.**

In the weeks following Baldacci's November 18, 2018 letter, the Shrine's architect, Thaddeus Siemasko ("Siemasko') communicated with various Town departments regarding what needed to be done by the plaintiff in order to close out the building permit and qualify for a certificate of occupancy. To that end, on December 19, 2019 Siemasko met with the Town's Health Director, Building Commissioner, Building Inspector and Plumbing Inspector. Siemasko summarized the discussion at the meeting in a memorandum dated the same day, which he subsequently provided both to Father Bushell and Baldacci. In it, Siemasko detailed his understanding of what construction and inspections were necessary for the Shrine to obtain a certificate of occupancy of either 99 people, 60 people or 20. **Exhibit 11,** Siemasko Memorandum. The memorandum concluded by stating:

> It is clear that the inspectors know the codes, are intent on applying them uniformly across the Town and, while trying to be helpful, will not let anything go, especially if written in black and white. As stated earlier, I'm charged with protecting health, safety and welfare through my interpretation of the code and following thru with construction control. The ultimate liability if there are issues falls to me and I intend to remain steadfast in my interpretations.

**Id.**

In an email to Baldacci on the following day, Siemasko indicated that Father Bushell had become upset with him after receiving the memo, alleging that Siemasko was not a client advocate and too conservative in his code interpretations. **Exhibit 12**, December 20, 2018 Email. Shortly thereafter, on January 7, 2019, Siemasko terminated his working relationship with Father

Bushell. In an email notifying Baldacci on the same day, Siemasko wrote, in pertinent part about Father Bushell:

> I truly believe I acted in his best interest in our meeting, while still addressing the building and health code issues that weighed on the potential occupancy. I believe the Town inspectors were very concerned that occupancy might happen without full code compliance and were pleased that I addressed your concerns directly in a professional and manner.
>
> I believe the final drawings I prepared were adequate for legal occupancy of 20, plus said staff/volunteer staff if all of the work depicted had been performed, and a greater occupancy allowed if the new toilet rooms were added. I cannot say why this wasn't acceptable.
>
> **Exhibit 13,** January 7, 2019 email.

In closing, Siemasko apologized and noted that this was the first time in his 31 years of practicing on the North Shore that a situation like this had happened. **Id.**

On January 16, 2019, Baldacci suspended the Plaintiffs' building permit (per Building Code) as the Project no longer had a registered design professional of record or acting construction supervisor. **Exhibit 14,** January 16, 2019 letter. On February 13, 2019, a new architect for the Project, Ryan McShera, provided a construction control affidavit to Baldacci in which he described the Project as a "Monastery Renovation". Based on McShera's description of the Project, as well as the confusion over what kind of occupancy and Building Code "use" the Shrine was seeking (which had caused Siemasko to leave the Project), Baldacci wrote to McShera on February 22, 2019 and requested (also per his authority under the Building Code) that McShera complete a code review. **Exhibit 15**, February 22, 2019 letter. Understandably, Baldacci also asked in the letter for confirmation as to what kind of occupancy the Shrine was

seeking for the structure depending on its anticipated use – the same issue that had now been unresolved for months.[4]

McShera agreed to conduct a code review, per Baldacci's request. For reasons unknown, however, he did not provide his review until over two months later, on May 1, 2019. **Exhibit 18,** McShera code review. In it, McShera opined, in part:

> Based upon our review of the International Building Code and our understanding of the proposed use of the building, it is our determination that Siemasko + Verbridge's original use group definitions for the project (A-2 for the Fellowship Hall, A-3 for the Chapel, and F-2 for the Brewery) are incorrect. We also find the designation of the A-2 use for the temporary occupancy permit to be incorrect.

**Id.**

In subsequent email communications over the next month, Baldacci and McShera discussed those aspects of applicable codes they agreed and disagreed on depending on what kind of certificate of occupancy it was that the Shrine would be seeking. **Exhibit 19,** McShera/Baldacci May emails. By letter dated June 11, 2019, Baldacci provided notice to McShera that he could not reinstate the building permit based upon disagreement over the "use" of the fellowship hall and Plaintiffs' failure to provide updated plans to the health and building departments. **Exhibit 20**, June 11, 2019 letter. After memorializing the points of disagreement over code interpretation, Baldacci listed what the Plaintiffs needed to provide for the building permit it to be reinstated:

---

[4] To the extent it hadn't already, the nature of the Shrine's renovation Project become even less clear based upon a February 6, 2006 letter to the Town sent by an attorney on behalf of the Plaintiffs. The letter claimed that the Shrine should properly be characterized as a house of worship and monastery – a different designation under the Building Code. **Exhibit 16**, February 6, 2019 Sidley Austin letter. In a response letter, Baldacci pointed out, among other things, that counsel's assertions made in the letter suggested that it was the Shrine's intention to abandon the purpose of the initial building permit and seek a new one altogether. **Exhibit 17**, February 11, 2019 letter.

- an updated set of plans describing the Fellowship hall bar area along with the health department stamped and approved fixtures, and
- an agreement to declare the use of the Fellowship Hall an A-2 use group occupancy with a maximum occupancy of 100, or
- a Variance from the Building Code of Appeals Board allowing an accessory use to the group, A-3, Place of Worship.

**Id.**

Rather than work to complete any of the items above, the Plaintiffs filed their complaint and motion for preliminary injunction in this matter on July 9, 2019. On July 25, 2019, the Plaintiffs appealed Baldacci's June 11, 2019 determination to the BCAB requesting that his decision be declared erroneous under the State Building Code and that the BCAB reinstate the building permit. **Exhibit 21**, Plaintiffs' BCAB Appeal. A hearing on Plaintiffs' appeal is currently set to occur on August 20, 2019. **Exhibit 22**, Notice of Hearing.

## II. ARGUMENT

### A. Standard of Review

In order for a preliminary injunction to issue, the moving party must show: (1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of the moving party's likelihood of success on the merits, the risk of irreparable harm to the moving party outweighs the potential harm to the nonmoving party in granting the injunction. *Boston Police Patrolmen's Ass'n, Inc. v. Police Dept. of Boston*, 446 mass. 46. (2006). The Plaintiff cannot make the requisite showing here for any of the three prongs above.

#### 1. The Plaintiffs Do Not Have a Credible RLUIPA Claim.

In moving for a preliminary injunction, the Plaintiffs contend that the Town's "refusal" to reinstate the building permit is an improper imposition of land use regulation in violation of 42 U.S.C. § 2000cc, the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

9

Plaintiffs' contention is based on a mischaracterized and myopic presentation of the relevant facts in an attempt to convince this Court that a violation of the law has occurred when the record proves otherwise. RLUIPA provides that:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> **(A)** is in furtherance of a compelling governmental interest; and
>
> **(B)** is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1)(A) and (B).

While RLUIPA does not define "substantial burden", the Supreme Court has made clear that the "hurdle is high" and issue is "intensely fact-specific". *Mintz v. Roman Catholic Bishop of Springfield*, 442 F. Supp. 2d. 309, 319 (D. Mass. 2006), *citing cases*. To be considered substantial, the government regulation must compel action or inaction with respect to a sincerely held belief; inconvenience to a religious institution or adherent is not enough. *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F. Supp. 2d. 1140 (2003) The Plaintiffs argue in their memorandum of law that the Defendants' supposed "refusal" to reinstate the building permit equates to a substantial burden on its ability freely exercise its religion. As there never has been a "refusal", the foundation of Plaintiff's argument is based on a false premise. The Plaintiffs also argue the Town's so-called "refusal" to reinstate the building permit has effectively prevented "***any*** manner of religious service or assembly". However, as discussed below, Plaintiffs offer no evidence to support this assertion and the record demonstrates that any delay in the Project has been due to Plaintiffs' own action or inaction.

First, as shown by the correspondence primarily between Baldacci and Father Bushell, the Defendants have in no way "refused" to reinstate the building permit in question. Since the Plaintiffs' purchase of the Property in November 2017, the Defendants and particularly Baldacci, have been nothing but open and helpful in offering their assistance to the Plaintiffs with their renovation Project. Time and again Baldacci wrote to Father Bushell, explaining the occupancy issues and inspection requirements associated with completing the project. Even when the Shrine began serving beer to the public without first obtaining a certificate of occupancy (which Baldacci repeatedly indicated was not allowed), rather than immediately fine the Shrine, Baldacci offered an alternative means of gaining a certificate of occupancy for 20 people as a means to accommodate the Shrine's religious practice based on the existing structure. The Shrine refused, even though it only had to submit to rudimentary inspections to obtain the occupancy certificate.

If anything, the extensive record of correspondence between the Defendants and representatives of the Shrine demonstrates that it was Father Bushell's refusal to comply with Baldacci's straightforward requests that led to the suspension and subsequent decision not to reinstate the building permit. It is no coincidence that an adjudicatory board, the BCAB, and Plaintiffs' *own* architect, Siemasko, both stated the Town has even-handedly applied the Building Code while at the same trying to be helpful in getting the Shrine to achieve its renovations goals. The reality is that as the Project began to move forward, the Shrine utterly disregarded its obligations under the building code and, more, illegally used the fellowship hall to serve beer.[5] The "substantial burden", to the extent any exists at all, was self-imposed and is

---

[5] Plaintiffs' memorandum focuses a great deal on the religious practice of brewing beer and whether or not the fellowship hall should be regarded as a primary or accessory religious use (p. 10). This is completely irrelevant. The Defendants never questioned the legitimacy of evangelizing in this manner.

not in any way under the circumstances a violation of RLUIPA. *See Ex. Andon, LLC v. City of Newport News, VA*, 813 F.3d 510 (2016) (holding no RLUIPA violation where alleged burdens were not imposed by the zoning board but plaintiff's own actions and inactions).

Second, Plaintiffs offer no evidence that Defendants have actually prevented the completion of the Project or, by some other means, precluded the Shrine from being used for religious purposes because of the renovations. Plaintiffs cannot plausibly shift blame to the Defendants for being unable to practice its religious in the Shrine during its renovations; that was always going to be the case. To the extent the Plaintiffs wish to use the fellowship hall to serve beer to patrons (as they have insisted upon doing despite Baldacci's admonitions and notice violations), there was, and is, a clear path to being permitted to do so, but the Plaintiffs have refused to follow it. Although Baldacci (and Plaintiffs' own architect, Siemasko) laid out how other certificates of occupancy could be obtained, the Plaintiffs have similarly refused to comply with code mandated requirements or provide required updated plans to pursue any of those options either.[6]

Plaintiff's contention that "[t]he only reason Mr. Baldacci ever advanced for suspending the Building Permit – *i.e.,* that there needed to be an architect and construction supervisor responsible for the internal renovations…" wholly ignores all of the other communications between the Defendants and Shrine, before and after the affidavit was provided, and the actual issues that led to Baldacci making the request in the first instance. An "intensely fact-specific"

---

Rather, the central and only question is if there was a "refusal" by the Defendants to provide the building permit, tantamount to creating a substantial burden on Plaintiffs' ability to exercise its religious freedom.
[6] To the extent that the Plaintiffs have not moved forward with the Project due to disagreement over Baldacci's interpretation of the Shrine's "use" (and accompanying occupancy limit) under the building code, that is relief they could have sought at any point throughout the duration of the Project by an appeal for a variance to the BCAB. The Plaintiffs only filed such an appeal for the first time on July 25, 2019, two weeks after the filing their complaint in this matter. A hearing on this issue is set for August 20, 2019.

examination of the full record illustrates a much different picture than the one Plaintiffs try to portray by their excerpting one document out of many, hoping to divert the Court away from the surrounding context. Based on *all* of the record evidence, Plaintiffs plainly cannot demonstrate the Defendants caused a "substantial burden" on their religious exercise.

Further, the Defendants' requirement that Plaintiffs obtain and maintain a building permit and comply with all applicable building codes does further a legitimate governmental interest in the least restrictive means possible. A certificate of occupancy – for whatever limit the Plaintiff may want – can only be issued, as Baldacci repeatedly explained to Father Bushell, if and when the Plaintiffs passed the necessary inspections to grant the particular certificate of occupancy in question. The Building Code is designed to protect public safety, as Siemasko explained in the email he sent to Baldacci while describing the anger he felt from Father Bushell when he refused to sidestep the code, "As stated earlier, I'm charged with protecting health, safety and welfare through my interpretation of the code and following thru with construction control." This basic governmental interest – keeping the public safe – was echoed in the BCAB's decision:

> "The life safety requirements that the Building Code imposes in these circumstances are intended to protect everyone who might use this building, regardless of his or her religious affiliation. Everyone who uses this building, regardless of her or his religious affiliation, is entitled to the same level of safety."

By seeking an order to reinstitute the building permit without first complying with basic safeguards mandated by the Building Code (electrical and plumbing inspections, etc,) the Plaintiffs are effectively asking the Court to order the Town to circumvent these life safety requirements. It is no coincidence Plaintiffs make no substantive argument in their memorandum that enforcing the code would be the least restrictive means of furthering life safety interests as there can be no other way but to enforce the code. The Defendants take their obligations under the code seriously and have treated have treated the Plaintiffs as they would any other applicant.

As the Plaintiffs do not have a likelihood of success on the merits of their RLUIPA claim, based both on the facts of the case and law as it is applied to them, its motion for a preliminary injunction must be denied.

### 2. The Plaintiffs Have Not Suffered Irreparable Harm.

Plaintiffs contend that they have suffered irreparable harm based on the Defendants' refusal to reinstate the building permit, arguing that even a temporary loss of first amendment freedoms can constitute irreparable harm. This argument once again ignores the obvious, that it is Plaintiffs own actions that led to the suspension of the building permit (causing Siemasko to end his relationship with the Shrine) and its own inaction that is the reason the permit has not been reinstated since then (providing updated plans or seeking a variance on the Shrine's "use" under the building code). Any delay in the Project has been entirely due to the Plaintiff.

Further, other than conclusory statements made in its memorandum, Plaintiffs have provided no evidence that the Project has actually inhibited the Plaintiffs from using the Shrine for religious purposes. If the confessional room is a different part of the Property from the Fellowship Hall, it is unclear how renovations to the Fellowship Hall would prevent services in the building. It is also unknown if Father Bushell has conducted confessionals during the Project, or to what extent. Leaving aside the many practical questions posed by Plaintiffs' broad assertions that the suspension of the building permit has somehow caused all religious exercise within the Property to stop, Plaintiffs' do not offer an affidavit from Father Bushell or any other evidence affirmatively demonstrating that there has been actual deprivation of protected first amendment rights. "To establish irreparable harm there must be an actual, viable, presently existing threat of serious harm." *Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991).

The Plaintiffs have not made this showing. As Plaintiffs cannot demonstrate true, irreparable harm, there is no need for a preliminary injunction to issue.

    3.   <u>The Balance of Hardships and Public Interest Weigh in Favor of the Defendants.</u>

For the reasons set forth above, the Defendants' interests in enforcing the building code for life safety reasons far outweigh reinstating the building permit which was only suspended in the first-place due to Plaintiffs' continued refusal to comply with its requirements. Plaintiffs also cannot credibly argue that they will suffer any hardship if an injunction does not issue, as it is the Plaintiffs that are fault for any delays that have occurred. Further, with a BCAB hearing set for August 20, 2019 on Plaintiffs Building Code appeal, it is likely that the certificate of occupancy issue will be resolved in the near future, completely obviating the need for an injunction at all.

**III.**   <u>**CONCLUSION**</u>

In light of the foregoing, the Defendant respectfully requests that this Court deny the Plaintiff's Motion for a Preliminary Injunction.

           Respectfully submitted,
           The Defendants,
           Richard Baldacci, in his official capacity
           As Building Commissioner for the
           Town of Marblehead, and the
           Town of Marblehead,

           By their attorneys,

           <u>*/s/ Leonard H. Kesten*</u>
           Leonard H. Kesten, BBO #542042
           Gregor A. Pagnini, BBO# 667659
           Brody, Hardoon, Perkins & Kesten, LLP
           699 Boylston Street
           Boston, MA 02116
           lkesten@bhpklaw.com
           gpagnini@bhpklaw.com
           617-880-7100

Dated:   August 16, 2019

**CERTIFICATE OF SERVICE**

I hereby certify that this document was filed through the ECF system and will therefore be sent electronically to the registered participants as identified on the Notice of Electric Filing (NEF) and paper copies will be sent to those participants indicated as non-registered participants.

*/s/ Leonard H. Kesten*
Leonard H. Kesten, BBO #542042