UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ST. PAUL'S FOUNDATION and SHRINE OF SAINT NICHOLAS THE WONDER WORKER, PATRON OF SAILORS, BREWERS AND REPENTANT THIEVES, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 19-cv-11504-DJC |
| RICHARD BALDACCI, in his official capacity as Building Commissioner for the Town of Marblehead, and THE TOWN OF MARBLEHEAD, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**MEMORANDUM AND ORDER**

**CASPER, J.**                                                                                  **May 21, 2021**

**I.    Introduction**

Plaintiffs St. Paul's Foundation and Shrine of Saint Nicholas the Wonder Worker, Patron of Sailors, Brewers and Repentant Thieves (collectively, "St. Paul's") filed this lawsuit against Richard Baldacci ("Baldacci") and the Town of Marblehead ("Town") (collectively, "Defendants") alleging a violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc. D. 1. The parties cross-moved for summary judgment. D. 42; D. 47. For the reasons stated below, the Court DENIES St. Paul's motion, D. 42, and ALLOWS Defendants' motion, D. 47.

1

## II.     Standard of Review

The Court grants summary judgment where there is no genuine dispute as to any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "A fact is material if it carries with it the potential to affect the outcome of the suit under applicable law."  Santiago–Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in its pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but must come forward with specific admissible facts showing that there is a genuine issue for trial.  Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor."  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).

## III.    Factual Background

The following facts are undisputed unless otherwise noted and are drawn from the parties' submissions of material facts, D. 44; D. 49, and responses to same, D. 52; D. 56.

### A.     St. Paul's Foundation

St. Paul's Foundation is an Orthodox Christian monastic organization located in Marblehead, Massachusetts, and led by Father Andrew Bushell ("Father Andrew").  Father Andrew serves as the Protos, or Executive Director, of St. Paul's.  D. 44 ¶¶ 3–4; D. 56 ¶¶ 3–4.  Father Andrew and St. Paul's formed the Shrine of St. Nicholas in June 2017, and Father Andrew serves as the Guardian of St. Nicholas.  D. 44 ¶¶ 5, 12; D. 56 ¶¶ 5, 12.

Father Andrew is an Orthodox Christian monk. D. 44 ¶ 9; D. 56 ¶ 9. He learned to brew beer, which Christian monks have traditionally made and served as part of their religious mission. D. 44 ¶¶ 6–8, 10–11; D. 56 ¶¶ 6–8, 10–11. This beer would be served at religious meals, would help evangelize others to the Orthodox Christian faith and would be sold to fund St. Paul's and St. Nicholas. Id.

St. Paul's owns a property in Marblehead, the Annunciation House, which primarily serves as a residence for Father Andrew and other clergy but has been used for religious gathering and services since 2012. D. 49 ¶ 2; D. 49-2 at 15, 24–25; D. 52 ¶ 2.

**B.  Renovation of the Property**

In August 2017, St. Paul's purchased 124 Pleasant Street in Marblehead (the "Property"). D. 44 ¶ 12; D. 56 ¶ 12. Father Andrew intended for the first floor of the Property to have three separate areas: a space to brew beer, a chapel for religious services and activities, and a fellowship hall to further hold religious programming, host communal meals, and for the public to consume and purchase the beer that he brews as a means of evangelizing and funding the organization. D. 44 ¶ 14; D. 56 ¶ 14. On November 13, 2017, Father Andrew e-mailed Baldacci, the Marblehead Building Commissioner, regarding the planned renovations of the Property. D. 49-1. Baldacci subsequently met with Father Andrew to discuss the intended use of the Property and renovations. D. 49 ¶ 3; D. 52 ¶ 3. Following the meeting, Baldacci wrote Father Andrew explaining the change of use, occupancy, inspection and permitting requirements for the renovation under the building code. Id.; D. 49-3; D. 49-7.

St. Paul's engaged the firm Siemasko & Verbridge ("S&V") as the architect for the renovation. D. 49 ¶ 4; D. 52 ¶ 4. In February 2018, Baldacci informed Father Andrew that because the Property required a change of use classification (i.e., from retail to assembly use), St. Paul's

3

would need a certificate of occupancy and certificate of inspection, otherwise St. Paul's could not serve food or drink to the public or hold religious services. D. 49 ¶ 9; D. 52 ¶ 9; D. 49-8. St. Paul's, however, could continue to use the Property according to its former retail and warehouse classification, which permitted it to sell prepackaged beer and other products. D. 49-8. In June 2018, St. Paul's applied for a building permit for internal first floor renovations in accordance with plans submitted by S&V as both architect and construction supervisor. D. 49 ¶¶ 13, 16; D. 52 ¶¶ 13, 16. The plans listed proposed work to include "chang[ing] the use of the first floor from a retail to an assembly A-2, add two bathrooms and A-2 hour fire rated ceiling, a bar area, with taps and dishwasher, commercial kitchen, walk-in cooler and concrete slab." D. 49 ¶ 17; D. 52 ¶ 17. The plans further identified the chapel area as an Assembly A-3 use, which covers "[p]laces of religious worship," among other non-religious uses like arcades, galleries, courtrooms and fitness facilities, and the fellowship hall where beer would be served to the public as an Assembly A-2 use, which "includes assembly uses intended for food and/or drink consumption," such as banquet halls, bars and restaurants. D. 44 ¶¶ 20–21; D. 56 ¶¶ 20–21. In July 2018, the Town issued a building permit (the "Permit") authorizing the renovations. D. 44 ¶ 20; D. 56 ¶ 20.

The relationship between St. Paul's and the Town began to deteriorate around fall 2018. Baldacci issued three letters each in September 2018, October 2018 and November 2018 warning St. Paul's of its noncompliance with the state building code, including uncompleted and unauthorized work as required by the code, and for occupying the space and serving beer to the public prior to an inspection and without a proper certificate of occupancy. D. 49-15; D. 49-16; D. 49-17. Baldacci's November 2018 letter notified St. Paul's that he had issued a building code violation for such conduct. D. 49-17. St. Paul's appealed this violation to the state Building Code Appeals Board ("BCAB"), which after a February of 2019 hearing, affirmed Baldacci's actions.

D. 49 ¶ 23; D. 52 ¶ 23; D. 49-30 at 6.  In its decision, the BCAB noted that Baldacci was justified in enforcing the building code to ensure the public's safety, and that a finding in favor of St. Paul's would "compromise life safety in ways that would conflict with [Massachusetts law]." D. 49-30 at 6.  The BCAB also concluded that there was no evidence of religious discrimination in the Town's enforcement of the Code, which St. Paul's had alleged in its appeal.  Id.

The relationship between St. Paul's and S&V also deteriorated.  See D. 49 ¶ 39; D. 52 ¶ 39.  On December 19, 2018, Thaddeus Siemasko of S&V met with Baldacci and the Town's health director, building inspector and plumbing inspector to discuss the status of the Property's renovation.  D. 49 ¶ 34; D. 52 ¶ 34.  Siemasko detailed his understanding of the Property's construction and inspection obligations in a memorandum dated that same day, which was provided to Father Andrew and Baldacci.  Id.; D. 49-22.  Baldacci replied and outlined three occupancy scenarios based on the number of handicap-accessible toilet facilities St. Paul's would agree to construct, one based on the original S&V plans and the others with fewer renovations and lower occupancy.  D. 49-24 at 1.  The parties dispute that understanding, specifically what each side agreed would need to be completed to achieve certain occupancy levels and what Father Andrew desired to be completed.  D. 49 ¶ 31–33; D. 52 at 17–18.  St. Paul's and S&V ended their relationship.  D. 49 ¶ 33; D. 52 ¶ 33.  In or about late December 2018, Siemasko informed Baldacci that S&V would no longer be working with St. Paul's.  D. 49-24 at 1.

  C. **Revocation of Building Permit and Attempted Reinstatement**

On January 16, 2019, Baldacci informed Father Andrew that the Town was suspending the Permit since the renovation no longer had a registered architect and that construction on the Property must immediately stop.  D. 49-25.  On February 13, 2019, Ryan McShera ("McShera"), another architect, assumed responsibility for the project.  D. 49-28 at 1–2.  On February 22, 2019,

5

Baldacci requested that McShera complete a code review confirming the use occupancy for the Property. D. 49-29. Baldacci told McShera that "[i]f the scope of work has changed or the occupancy requested is not identical to that which was previously permitted, then the building department will close [the Permit] and a new application should follow." Id.

On May 1, 2019, McShera submitted his code review to Baldacci, which concluded that the previous use designations made by S&V were "incorrect." D. 49-31 at 2. McShera wrote that it was his "intent to carry out the proposed work in accordance with the previously submitted plans," but that he believed the Property should be classified as a residential monastery (R-2) with the entire first floor as an A-4 classification. Id. at 2–3. Throughout May 2019, Baldacci and McShera communicated about the use designation for the Property, but were unable to agree on the designation for the Fellowship Hall, which Baldacci maintained was A-2 (as stated in S&V's original plans) and what construction would follow such designation (e.g., accessible toilet facilities). D. 49-32; D. 45-10 at 3.

On June 11, 2019, Baldacci informed McShera that the Town would not reinstate the Permit unless McShera submitted an updated set of plans for approval, agreed to the A-2 use designation for the Fellowship Hall, or obtained a BCAB variance allowing "accessory use" of an A-3 designation (for service of food and drink). D. 45-10 at 3. St. Paul's appealed Baldacci's decision to the BCAB on July 29, 2019, and the BCAB held a hearing on August 20, 2019. D. 49-35 at 2. In its opinion, the BCAB "generally agreed with [Baldacci's] conditions" and wrote that Baldacci and McShera's "very different understandings" of the use determination "would lead to very different requirements" for the renovation, since McShera "concluded that a different Use Group [from the previously submitted plans] (R-2) was correct." Id. at 4–5. St. Paul's agreed to follow the original renovation plans submitted by S&V and the BCAB ordered the Permit re-

6

instated on the condition that all submissions made to the Town by St. Paul's after January 15, 2019 would be disregarded, and updated plans approved by the Town's Health Department would be submitted to the Building Department prior to final inspection of the Property. Id. at 5.

As of September 24, 2019, the Town reinstated the Permit and in December 2019, issued a temporary use and occupancy permit to St. Paul's, but required that it refrain from serving beer to the public until renovations were completed and a plan submitted to the health department was approved. D. 49 ¶ 60; D. 49-36; D. 52 ¶ 60.

### IV.  Procedural History

St. Paul's instituted this action on July 9, 2019 and moved for a preliminary injunction requiring the Town to reinstate the Permit. D.1; D. 8. While that motion was pending, St. Paul's appealed to the BCAB, which led to the Town reinstating the Permit, and this Court subsequently denied the motion for a preliminary injunction as moot. D. 27. The parties have now cross-moved for summary judgment, although St. Paul's motion seeks summary judgment only to liability under RLUIPA. D. 42; D. 47. The Court heard the parties on the pending motions and took these matters under advisement. D. 59.

### V.  Discussion

#### A.  RLUIPA

St. Paul' sole claim is that the Town violated RLUIPA's substantial burden provision, which states, in relevant part, that:

> [n]o government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution—
>
> (A) is in furtherance of a compelling governmental interest; and

7

>   (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  RLUIPA "targets . . . local [] land-use regulation" and "accord[s] heightened statutory protection to religious exercise . . . in all cases where free exercise of religion is substantially burdened."  Sossamon v. Texas, 563 U.S. 277, 281 (2011).

RLUIPA's substantial burden provision applies "in any case" where, as relevant here, the substantial burden "is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved."  42 U.S.C. § 2000cc(a)(2).  St. Paul's argues that the statute's reference to "land use regulations" includes "building codes, environmental codes, and other laws that [may] prevent, delay, or otherwise impede the construction or use of a property by a religious entity," relying on three out-of-circuit cases for this proposition.  D. 51 at 13.  The Town disagrees, arguing that applying the building code is not "the implementation of a land use regulation."  D. 48 at 14.

The statute defines "land use regulation" as a "zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land) . . . ." 42 U.S.C. § 2000cc-5(5).  The statute does not define "zoning or landmarking law," and neither the Supreme Court nor the First Circuit has squarely addressed whether implementation of a land use regulation includes building code and permitting matters like those at issue here.  Courts that have addressed the issue generally hold that a "government agency implements a 'land use regulation' only when it acts pursuant to a 'zoning or landmarking law' that limits the manner in which a claimant may develop or use property in which the claimant has an interest."  Prater v. City of Burnside, Ky., 289 F.3d 417, 434 (6th Cir. 2002); Vision Church

v. Vill. of Long Grove, 468 F.3d 975, 998 (7th Cir. 2006) (ruling that village's use of annexation statute outside of RLUIPA's scope because annexation not pursuant to a zoning or landmarking law); Second Baptist Church of Leechburg v. Gilpin Twp, Pennsylvania, 118 F. App'x 615, 617 (3d Cir. 2004) (concluding town's enforcement of building code requiring connected sewer tap outside of RLUIPA's scope because it "was not enacted pursuant to a zoning or landmarking law"); Anselmo v. Cty. of Shasta, Cal., 873 F. Supp. 2d 1247, 1257 (E.D. Cal. 2012) (ruling that municipal code requiring construction permit was not land use regulation).

St. Paul's relies upon three cases in support of its contention about RLUIPA's reach, but none of these cases warrants a result in its favor here. In Fortress Bible Church v. Feiner, 694 F.3d 208, 216–18 (2d Cir. 2012), the Second Circuit held that decisions of a "statutory environmental review process . . . constitute the application of a zoning law and are within the purview of RLUIPA" only when the government uses that process "as the primary vehicle for making zoning decisions," so that a locality does not, as the court found there, "disingenuously use[] [the environmental review process] to obstruct and ultimately deny the Church's project." In Layman Lessons Church v. Metro. Gov't of Nashville/Davidson Cty., No. 3:18-CV-0107, 2019 WL 1746512, at *4 (M.D. Tenn. Apr. 18, 2019), the court ruled that Defendant's "misuse[d] . . . both zoning and non-zoning regulations . . . to prevent Plaintiff's use of the property." The court articulated that when a "locality disingenuously use[s] its procedures to obstruct and ultimately deny a plaintiff's religious building, courts decline to insulate the municipality from liability with regard to its decisions on zoning issues simply because it decided them under the rubric of an ostensibly non-zoning process." In United States v. Cty. of Culpeper, Virginia, 245 F. Supp. 3d 758, 768 (W.D. Va. 2017), the County's "zoning laws ma[de] it impossible to receive permission from the County to build a structure without first obtaining the necessary sewage permit (which

9

the County here refused to grant)," therefore the sewage "permitting process [was] considered a 'zoning law' under RLUIPA."

Here, the Town's conditional revocation of the Permit was not pursuant to a zoning or landmarking law, but rather the state building code. Unlike the cases cited by St. Paul's, the Town issued the Permit, construction under the Permit had gone forward and even the revocation of same (prompted by the termination of its original architect) was temporary pending certain conditions: full inspection and either agreement to original plans' use designation or variance for other use designation. D. 49-33 at 2. Even though Baldacci's conditions for reinstatement centered on proper use designation and occupancy, the conditions were not imposed to prohibit or limit St. Paul's from using the space as they intended, but rather about what the proper scope of the renovation — and therefore the Permit — would be. Baldacci approved the first plans to renovate the Property for both A-2 and A-3 assembly uses, which would have allowed St. Paul's to carry out its stated intentions for the Property (i.e., its religious exercise). D. 44 ¶¶ 20–21; D. 56 ¶¶ 20–21. Baldacci revoked the Permit because St. Paul's and its original architect terminated their relationship. D. 49-25. When McShera signed on as the new architect, Baldacci requested that he submit a review of the project's original, approved plans to ensure that McShera agreed with them. That review lasted until May 2019 when McShera wrote Baldacci that the original plans' use designations were "incorrect." D. 49-29; D. 49-31 at 2.

The Court is not persuaded that the Town's revocation of the Permit amounts to implementation of land use regulations even as they have been interpreted by the cases cited by St. Paul's. St. Paul's has not alleged sufficient facts to suggest that the Town functionally utilized its building permit process, or the interim code review imposed by Baldacci, to make its zoning decisions or that the process was disingenuously used to limit or prohibit St. Paul's from using the

Property as intended. Moreover, St. Paul's has not pointed to any authority within the First Circuit (or elsewhere) suggesting that issuance and revocation of building permits for renovations—so that the renovations accord with universal building codes—constitutes a "land use regulation" or "zoning law," covered by RLUIPA. This Court, therefore, concludes that the Town's conditional refusal to reinstate the Building Permit falls outside RLUIPA's jurisdiction.

### B. Substantial Burden

Even assuming *arguendo* that the Town's revocation of the Permit falls under RLUIPA, St. Paul's has also failed to show that such action placed a substantial burden on its exercise of religion. St. Paul's argues that the Town's conditional refusal to reinstate the Permit after McShera assumed control of the project substantially burdened St. Paul's exercise of religion because it prevented them from using the Property for religious exercise between February and September 2019. D. 43 at 20. St. Paul's "bears the burden of demonstrating" that the Town's refusal to reinstate the building permit "imposes a 'substantial burden' on its religious exercise." Roman Catholic Bishop of Springfield v. City of Springfield, 724 F.3d 78, 94 (1st Cir. 2013). Although neither the statute nor the Supreme Court has defined "substantial burden," the First Circuit "use[s] a functional approach to the facts of a particular case [and] recognize[s] different types of burdens and that such burdens may cumulate to become substantial." Id. at 95. The Circuit also "applie[s] a 'common-usage understanding' of . . . burden [as] 'something . . . oppressive or worrisome,' while something 'substantial' is . . . 'significantly great.'" Signs for Jesus v. Town of Pembroke, NH, 977 F.3d 93, 111 (1st Cir. 2020) (quoting Roman Catholic Bishop of Springfield, 724 F.3d at 95–96). In taking this approach, the First Circuit "outlined factors [for] determining whether a particular regulation imposes a substantial burden: 1) 'whether the regulation at issue appears to target a religion . . . because of hostility to that religion itself'; 2) whether the regulation was

11

'imposed on the religious institution arbitrarily, capriciously, or unlawfully'; and 3) 'whether local regulators have subjected the religious organization to a process that may appear neutral on its face but in practice is designed to reach a predetermined outcome contrary to the group's requests.'" Id. (quoting Roman Catholic Bishop of Springfield, 724 F.3d at 96–97).

Of these factors, St. Paul's argues only that the Baldacci's conditional refusal to reinstate the Permit was arbitrary and capricious. D. 43 at 21; D. 51 at 14. A decision may be arbitrary and capricious when "local regulators disregard objective criteria and instead act adversely to a religious organization based on the objections of a 'small but influential' group in the community . . . [or] where local regulators base their decisions on misunderstandings of legal principles" suggesting these regulators were "playing a delaying game," and when these regulators "'operat[e] without procedural safeguards.'" Roman Catholic Bishop of Springfield, 724 F.3d at 97 (citations omitted).

St. Paul's asserts that Baldacci's decision was arbitrary and capricious because his alleged rationale, "to pressure [St. Paul's] into abandoning their request that the fellowship hall be regulated as a Church Use, rather than a Bar Use," was not legitimate. D. 43 at 21. As support, St. Paul's relies upon its interpretation of the BCAB's July 2019 decision that the "use classification dispute was no reason for Defendants to deny Plaintiffs the ability to move forward with the Project; any dispute . . . could be resolved later, after construction of the monastic complex is complete." Id. St. Paul's further argues Baldacci's actions were unnecessary and unjustified, therefore arbitrary and capricious, because St. Paul's always intended and was only permitted to build to the original plans. D. 43 at 21–22; D. 51 at 15.

The undisputed factual record shows, however, that Baldacci's rationale was that St. Paul's new architect's conclusion that the original plans were "incorrect." First, the Town agreed

with St. Paul's own architect's initial use determination (i.e., A-2 for the fellowship hall) to issue the Permit, which led to certain renovation requirements for minimum occupancy; but such work was not completed prior to St. Paul's occupying the space and serving beer to the public, which also required a building and health inspection and certificate of occupancy. St. Paul's received no such certificate, did not complete inspection requirements, and was observed serving beer to the public, which resulted in St. Paul's receiving a building violation. D. 49-16; D. 49-17; D. 49-18; D. 49-21; D. 49-22; D. 49-23; D. 49-30 at 5–6. The BCAB affirmed Baldacci's actions. D. 49-30 at 5–6. St. Paul's then ended its relationship with S&V and hired McShera as its new architect and contractor, who agreed to sign for the Permit and complete a building code review before it would be reinstated. D. 49-28; 49-29. Three months later, McShera completed the review and informed Baldacci that he believed the use designations underlying the original plans were "incorrect." D. 49-31 at 2. Despite this, St. Paul's claims that releasing the original permit only allowed the work included in the original permit, and that St. Paul's made clear to Baldacci that the scope of work had not changed. D. 43 at 22; D. 51 at 15. Yet McShera's code review in May 2019 discussed how additional toilet facilities, plumbing work, and egress would be impacted or changed by his interpretation of the code and updated proposed designation. D. 49-31 at 2–3. As the BCAB found, these proposed designations meant different renovations would follow because they "would lead to very different requirements" for occupancy. D. 49-30 at 5–6.

  Moreover, St. Paul's assertion that the Town was attempting to force St. Paul's to be a "bar use" rather than "church use" is not supported by the text of the building code itself or the record here. While the building code lists taverns and bars as an example of an A-2 use, A-2 is defined in the building code as "assembly uses intended for food and/or drink consumption,"

13

and A-3 as "assembly uses intended for worship, recreation or amusement and other assembly uses not classified elsewhere in Group A," which includes places of worship as an example but also includes arcades, galleries, courtrooms, funeral parlors and libraries. D. 56 at 8; §§ 303.3–303.4, 2015 International Building Code. The building code also requires separate use classifications for spaces that are meant to be occupied at different times and for different purposes. See id. § 302.1. Aside from McShera's code review, St. Paul's has not submitted other evidence to show that S&V or Baldacci's interpretation of the code, specifically that the fellowship hall would be classified as A-2 where the public would purchase and consume beer, was erroneous or unreasonable.

Regardless of what the Property's correct use designation may be, Baldacci's decision not to reinstate the Building Permit on this basis was not arbitrary and capricious where McShera disputed such designation provided in St. Paul's original plans and Permit, and the use designation impacted the work that would need to be completed by St. Paul's. D. 49-31 at 2–3. The BCAB conditioned its decision to reinstate the Permit, acknowledging that further disagreement could be resolved after renovations were complete, on St. Paul's decision to adopt the initial plans submitted by S&V in their entirety (including the use designation) and that St. Paul's would disregard any submissions made to the Town after January 15, 2019, prior to McShera's review. Contrary to St. Paul's characterization, this decision does not suggest that the BCAB found Baldacci's conditional refusal to reinstate the permit unjustified or that his action was arbitrary and capricious as to St. Paul's claim before this Court.

St. Paul's other arguments that the Town's actions substantially burdened it are likewise unpersuasive. St. Paul's relies upon Mintz v. Roman Catholic Bishop of Springfield—decided before the First Circuit outlined its substantial burden criteria—for the proposition that refusal

14

to issue a building permit intended for religious use and for a significant period substantially infringes on the free exercise of religion, D. 43 at 19–20, but Mintz concerned a different burden than what St. Paul's faces here: an absolute and conclusive denial of a permit, as the bylaw at issue "preclude[d] any additional construction or property owned by the religious institution." Mintz v. Roman Catholic Bishop of Springfield, 424 F. Supp. 2d 309, 321 (D. Mass. 2006) (emphasis in original). Here, Baldacci revoked the Permit conditionally and explained the conditions for it to be reinstated. D. 49-33 at 2. Baldacci both approved the Permit in the first instance and then conditioned its reinstatement on St. Paul's performing these requirements. Accordingly, St. Paul's has "not establish[ed] a process, apparently neutral, that in fact will result in the denial of any request that [St. Paul's] may make to the [Town]." Roman Catholic Bishop of Springfield, 724 F.3d at 99 (finding no RLIUPA substantial burden); see Westchester Day Sch. v. Vill. of Mamaroneck, 386 F.3d 183, 188–89 (2d Cir. 2004) (reasoning that "rejection of a submitted plan, while leaving open the possibility of approval of a resubmission with modifications designed to address the cited problems, is less likely to constitute a 'substantial burden' than definitive rejection of the same plan, ruling out the possibility of approval of a modified proposal").

The requirements imposed by the Town burden St. Paul's insofar as they must conduct additional review or submit additional plans for approval, which delays the project and increases the overall cost. In the absence, however, of a showing that such requirements would result in absolute denial of the project or the intended religious exercise, are hostile to same, had a predetermined outcome or were arbitrary and capricious, St. Paul's is left challenging the Town's building permit process generally, which is not—on its own—a substantial burden. See Roman Catholic Bishop of Springfield, 724 F.3d at 99–100 (finding no substantial burden from "the

15

mere existence of some expenses" flowing from city permit process and from possibility of two-month delay awaiting city approval of plans or being fined for renovating without approval); Stark v. Town of Rumford, No. 2:20-CV-00066-JDL, 2020 WL 6785935, at *5 (D. Me. Nov. 18, 2020) (finding that "[t]he mere fact that [the town official] enforced the [change-of-use] ordinance against the Library, without more, does not support a reasonable inference that the enforcement was arbitrary, unlawful or based on animus"); San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1035 (9th Cir. 2004) (concluding that the requirement that the applicant "submit a complete application, as required of all applicants . . . imposes no restriction whatsoever" and therefore does not impose a substantial burden on religious exercise) (emphasis in original); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1227 n.11 (11th Cir. 2004) (concluding that "[r]equiring churches . . . to apply for [Use Permits that] allow[] the zoning commission to consider factors such as size [and] congruity with existing uses [are] reasonable 'run of the mill' . . . considerations [that] do not constitute substantial burdens on religious exercise."). Spending "considerable time and money" to comply with city zoning and building requirements "does not entitle . . . relief under RLUIPA's substantial burden provision." Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752, 761–62 (7th Cir. 2003). "Otherwise, compliance with RLUIPA would require municipal governments not merely to treat religious land uses on an equal footing with nonreligious land uses, but rather to favor them in the form of an outright exemption from land-use regulations." Id.

St. Paul's has not established that the Town's conditional refusal to reinstate the Permit was arbitrary and capricious. Without that showing, and since RLUIPA "does not mean that any land use restriction on a religious organization imposes a substantial burden," Roman Catholic

16

Bishop of Springfield, 724 F.3d at 96 (emphasis in original), St. Paul's has failed to show on the undisputed record that the Town's actions violate RLUIPA.

## VI. Conclusion

For the foregoing reasons, the Court DENIES St. Paul's motion, D. 42, and ALLOWS Defendants' motion, D. 47.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge

\